RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0088P (6th Cir.)
File Name: 03a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: TRI-CITY TURF CLUB,
INC.,

     *Debtor.*

No. 01-6216

PHAEDRA SPRADLIN,
     *Trustee-Appellant,*

*v.*

PHILIP D. JARVIS,
     *Defendant-Appellee,*

NCI BUILDING SYSTEMS, L.P.,
     *Movant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 99-00119—Henry R. Wilhoit, Jr., District Judge.

Argued: February 5, 2003

Decided and Filed: March 24, 2003

---

Before: GILMAN and GIBBONS, Circuit Judges;
POLSTER, District Judge.[*]

---

### COUNSEL

**ARGUED:** John O. Morgan, Jr., Lexington, Kentucky, for Appellant. Robert S. Ryan, FOWLER, MEASLE & BELL, Lexington, Kentucky, for Appellees. **ON BRIEF:** John O. Morgan, Jr., Lexington, Kentucky, for Appellant. Robert S. Ryan, FOWLER, MEASLE & BELL, Lexington, Kentucky, for Appellees.

---

### OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Debtor Tri-City Turf Club, Inc. instituted an adversary proceeding in the United States Bankruptcy Court for the Eastern District of Kentucky against NCI Building Systems, L.P. (NCI) alleging that NCI's reclamation of fabricated steel was a voidable preference pursuant to 11 U.S.C. § 547. Upon NCI's motion, the district court withdrew the reference of the proceeding to the bankruptcy court. NCI then filed a motion for summary judgment, arguing that its recovery of the fabricated steel did not constitute a preferential transfer. The district court granted NCI's motion. Phaedra Spradlin, Trustee for the bankruptcy estate of Tri-City, appeals the district court's grant of summary judgment. For the reasons set forth below, we affirm the judgment of the district court.

---

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

## I.

Tri-City Turf Club, Inc. was formed in 1987 for the purpose of developing, constructing and operating a thoroughbred horse race track. On April 19, 1994, Tri-City and Philip D. Jarvis d/b/a Jarvis Construction (Jarvis) entered into a written contract, the Phase II Contract, for the construction of the clubhouse and grandstand. The Phase II Contract stated that its provisions were to be incorporated by reference into any subcontract. Shortly after entering into the Phase II Contract, Jarvis entered into an agreement with NCI for the fabrication of steel for the grandstand, the NCI Contract. Tri-City was not a party to the NCI Contract, and NCI was not a party to the Phase II Contract.

Pursuant to the NCI Contract, NCI agreed to deliver the fabricated steel to the building site in Ashland, Kentucky. The NCI Contract had an acceptance date of July 19, 1994, and a requested shipping date seven weeks from the date of acceptance. Jarvis was required to make an initial payment of fifty percent ($357,000) of the total contract price with the balance due in cash on delivery of the specially fabricated steel. At Jarvis's request, Tri-City made the initial payment of $357,000 directly to NCI. NCI spent $347,421.19 of the initial payment on drawings, engineering work, and subcontracts for a substantial portion of the steel fabrication. NCI understood that the balance due on the NCI Contract would be paid in full to NCI as soon as the first shipment of steel was delivered.

Between August 30, 1994, and September 19, 1994, NCI made eleven shipments of steel to the Ashland, Kentucky construction site. According to the Trustee, NCI delivered between one-half and two-thirds of the requested steel to the construction site. NCI received no payments other than the initial $357,000. On September 21, 1994, Jarvis advised NCI in writing that the balance due on the contract would not be forthcoming and directed NCI to remove the previously delivered steel from the construction site. In response to Jarvis's letter, NCI gave Jarvis written notification of

reclamation and informed Jarvis that the remaining three loads of steel would not be delivered. On September 22 and 23, 1994, NCI reclaimed the majority of the steel located at the construction site. NCI declined to remove two and a half loads of steel due to insufficient truck space.

On October 24, 1994, the Florida Insurance Commissioner filed an involuntary petition against Tri-City under Chapter 7 of the Bankruptcy Code. In response, Tri-City filed a Chapter 11 bankruptcy petition, and the bankruptcy court entered an order converting the case to a Chapter 11 proceeding. On December 13, 1994, Tri-City filed the instant adversary proceeding against NCI. In 1995, the case was again converted by the bankruptcy court and returned to its original status under Chapter 7. Spradlin was appointed Chapter 7 Trustee and was substituted as party plaintiff in this proceeding. In August 1996, the remaining steel at the construction site was sold at public auction for approximately $9,000, the scrap value of the steel. NCI has never filed a claim in the bankruptcy proceeding relating to the NCI Contract or the steel auctioned by the Trustee.[1]

In April 1999, NCI filed a motion to withdraw the reference to the bankruptcy court on the grounds that the bankruptcy judge had determined that the claims of the Trustee against NCI and NCI's defenses were triable by a jury and the bankruptcy judge was not specifically designated to conduct such a jury trial. In July 2000, the district court determined that there was sufficient cause for withdrawal and withdrew the reference of the Trustee's preference claim against NCI. On December 29, 2000, NCI moved for summary judgment in the district court. According to the district court, the summary judgment decision turned on a relatively simple

---

[1] The steel involved in this case was specially engineered for this project. Around the time this adversary proceeding was filed, NCI offered to return the steel in settlement of this matter, but the Trustee declined the offer. Deposition testimony established that the fair market value (scrap) of the reclaimed steel was five cents per pound, or $18,670.15.

point of law. The district court first noted that Tri-City, as a third-party beneficiary, could assert only the rights available to Jarvis. Because Tri-City's rights to the steel never accrued pursuant to the terms of the Phase II Contract with Jarvis, the steel would never have been part of Tri-City's bankruptcy estate even if it had not been transferred before the commencement of bankruptcy proceedings. Therefore, the district court granted summary judgment and found that no preferential transfer had occurred. This timely appeal followed.

## II.

This court reviews *de novo* a district court's grant or denial of a motion for summary judgment. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 492-93 (6th Cir. 2001). When reviewing the record, all inferences are to be drawn in the light most favorable to the non-moving party. *Id.* at 493 (citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245-46 (6th Cir. 1997)). However, a party opposing a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite*, 258 F.3d at 493 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998)) (citation omitted).

The Trustee contends that the district court erred in determining that the recovery of fabricated steel by NCI from the construction site in Ashland, Kentucky, was not a preferential transfer pursuant to 11 U.S.C. § 547. The Trustee argues that the district court's error stems, in part, from its erroneous conclusion that Tri-City had no valid interest in the steel as a third-party beneficiary. The Trustee contends that

the NCI Contract "conferred upon Tri-City the status of a third-party beneficiary" and argues that Tri-City meets the definition of third-party beneficiary under Kentucky law.

According to 11 U.S.C. § 547(b), the Trustee may avoid:

any transfer of an interest of the debtor in property–
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made –
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if–
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

While the Bankruptcy Code does not define "property of the debtor," the Supreme Court has noted that the term is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58-59 (1990).[2] In defining "an interest of the debtor in property," the Sixth Circuit looks to 11 U.S.C. § 541(a)(1), which provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Cannon*, 277 F.3d 838, 849 (6th Cir. 2002). Furthermore, in the absence of controlling federal bankruptcy law, the substantive nature of

---

[2] As the Supreme Court pointed out, the 1984 amendments to § 547(b) substituted "an interest of the debtor in property" for "property of the debtor." *Begier*, 496 U.S. at 59 n.3.

the property interest held by a bankrupt and its creditors is defined by state law. *See id.*; *see also In re Maple Mortgage, Inc.*, 81 F.3d 592, 596 (5th Cir. 1996).

The Trustee fails to articulate the nature of Tri-City's alleged interest in the steel. Instead, the Trustee points to Tri-City's status as a third-party beneficiary of the NCI Contract and its payment of amounts owed by Jarvis under that contract. We agree that Tri-City is a third-party beneficiary of the NCI Contract. Yet, as a third-party beneficiary, Tri-City can assert only the rights available to Jarvis under the contract. *See Sun Indem. Co. v. Dulaney*, 89 S.W.2d 307, 311 (Ky. 1935). Moreover, "one who sues on a contract made for his benefit must accept the contract as it was made." *Id.* (quotations and citations omitted). Accordingly, Tri-City's interest in the fabricated steel is dictated by the NCI Contract and the Phase II Contract, the terms of which were incorporated into the NCI Contract.

Pursuant to the NCI Contract, Jarvis agreed to make an initial payment of fifty percent of the balance and to pay the remaining fifty percent "COD" (cash on delivery). The NCI contract does not define delivery. According to the Phase II Contract, Jarvis assumed all risks associated with construction until the construction was "completed and accepted" or until work done in construction progressed to the point of inclusion in the monthly estimate.[3] Therefore, pursuant to the Phase II

---

[3] Section 15 of the Phase II Contract provides:
Contractor's Risks
    Work covered by this Contract shall be at risk of CONTRACTOR [Jarvis] in every respect, and he shall be responsible thereof until it is completed and accepted. This responsibility shall include, without limitation, damage to and loss of any material furnished and delivered by OWNER [Tri-City] for incorporation in the Work.

Section 47 of the Phase II Contract provides in relevant part:
    Periodic Estimate
        Except as herein or otherwise provided, payment for work done under this Contract will be made on 20-day intervals as the

---

Contract, the risk of loss remained with Jarvis until either or both of those events occurred.

Neither of the events specified in the Phase II Contract by which Tri-City would have acquired an interest in the fabricated steel occurred prior to NCI's reclamation of the steel. Tri-City contracted for a particular set of rights under the Phase II Contract and agreed that those rights would be incorporated in any agreements with subcontractors. Having clearly chosen to limit its rights in contracts between Jarvis and subcontractors such as NCI and to insulate itself from the risks and obligations of the NCI Contract except under limited circumstances, Tri-City never acquired an interest in the steel.

The Trustee apparently argues that Jarvis had an interest in the fabricated steel as of the time Tri-City made the initial payment to NCI. She fails, however, to point to any contract terms or case law supporting the argument that Jarvis gained an interest in the steel upon payment of the initial fifty percent of the amount owed. Instead, the evidence presented, including the language of the NCI Contract, and the only statute cited on this point by either party, indicate that title to

---

Work progresses. So long as the Work is prosecuted in accordance with the provisions of this Contract, and with such progress as may be satisfactory to OWNER. [sic] OWNER will, on or about the first day of each month, make an approximate estimate of the proportionate value of the work done up to such time. The amount of the estimate, less a retained amount of 10 percent and less previous payments, shall be paid to CONTRACTOR as such thereafter possible. Work and material included in such estimate shall be the property of the OWNER . . . .

The Phase II Contract describes Work in Section 1 of the contract as follows:
    Contractor shall furnish all materials, superintendence, labor, equipment, tools, supplies, and transportation except as hereinafter specified, and execute, construct and finish in an expeditious, substantial and workman-like manner, satisfactory to OWNER . . . .

the steel would not pass from NCI to Jarvis until the steel was released to Jarvis upon payment by Jarvis of the balance due on the contract.

First, Leonard George, president of NCI, stated in his affidavit that NCI would not release the steel to Jarvis until Jarvis paid the balance due under the NCI Contract. In addition, Jarvis's conduct indicates that Jarvis did not believe that NCI had released the steel to Jarvis or that Jarvis had title to the steel. Upon learning that funds from Tri-City were not forthcoming, Jarvis informed NCI that it should "suspend all action on this job and take any necessary steps to secure the interest of your company." Philip Jarvis testified that after Tri-City failed to send the funds as promised, he "called NCI and told them to send me some trucks . . . . and I loaded – started loading [the steel] up and sent it back." Next, the NCI Contract provides, in part, that "any risk associated with the metal building system being sold hereunder rests with the Seller [NCI] up to the time of delivery of the goods to Buyer at the place of delivery." Moreover, Kentucky Revised Statute § 355.2-507(2) provides that "[w]here payment is due and demanded on delivery to the buyer of goods . . ., his right as against the seller to retain or dispose of them is conditioned upon his making the payment due." *See also* Ky. Rev. Stat. § 355.2-401(4) (stating that "[a] rejection or other refusal by the buyer to receive or retain goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'").

While we recognize that Jarvis and therefore Tri-City could arguably possess an interest in the property even if legal title to the property did not pass from NCI to Jarvis, Tri-City has failed to present evidence that the down payment on the NCI Contract accompanied with its status as a third-party beneficiary to the NCI Contract gave Tri-City any interest in the steel sufficient to establish that the steel would have been part of the estate. Because the fabricated steel was never "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy

proceedings," no preferential transfer occurred. *Begier*, 496 U.S. at 58.

### III.

For the reasons set forth above, we affirm the judgment of the district court.