**In re PHOENIX RESTAURANT GROUP, INC., et al., Debtors.**

**Phoenix Restaurant Group, Inc., et al., Plaintiffs,**

**v.**

**Lawson Software, Inc., Defendant.**

**Bankruptcy No. 301–12036.**
**Adversary No. 303–0720.**

United States Bankruptcy Court, M.D. Tennessee.

Nov. 15, 2004.

Beth A. Dunning, Dunning Law Group, PLLC, Brentwood, TN, Samuel K. Crocker, Timothy G. Niarhos, Nashville, TN, for Consolidated Debtors acting by and through Plan Administrator.

Candace L. Reed, Miller & Martin, PLLC, Nashville, TN, William J. Fisher, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, for Lawson Software, Inc.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issues on summary judgment are: 1) Is this preference action barred by res judicata or judicial estoppel attendant to confirmation of the plan; and 2) is the subsequent new value defense in 11 U.S.C. § 547(c)(4) available to this defendant. This action is not precluded by confirmation because the Confirmed Plan and Disclosure Statement adequately preserved preference actions. Defendant's subsequent new value defense cannot be resolved on summary judgment because of material disputed facts.

### I. FACTS

Phoenix Restaurant Group, Inc. ("PRG"), a Georgia corporation, resulted from a 1996 merger between Denwest Restaurant Corp. and American Family Restaurants. The principal business of PRG was operating Denny's family style restaurants pursuant to franchise agreements with Advantica Restaurant Group, Inc. (and its predecessors and successors). Throughout the 1990's PRG acquired Denny's locations, and expanded into other restaurant concepts, including Black–Eyed Pea restaurants. In September 2001, PRG operated 96 Denny's restaurants and 91 Black–Eyed Pea restaurants primarily in Florida, Texas, Arizona, Colorado and Oklahoma.

On October 18, 2001, an involuntary Chapter 7 proceeding was filed against PRG in the Middle District of Florida. The involuntary case was transferred to the Middle District of Tennessee by order entered October 29, 2001. On October 31, 2001, PRG moved to convert the involuntary Chapter 7 case to a voluntary Chapter 11. Also on October 31, 2001, five affiliates of PRG—Denam, Inc., Phoenix Foods, Inc., Black–Eyed Pea U.S.A., Inc., Prufrock Restaurants of Kansas, Inc. and Texas BEP, L.P.—filed voluntary Chapter 11 cases in the Middle District of Tennessee. An order converting PRG's case to Chapter 11 was entered November 6, 2001.

The Debtors remained in possession. On April 29, 2002, the Debtors filed a Joint Liquidating Plan of Reorganization and Disclosure Statement. On October 23, 2002, the First Amended Joint Liquidating Plan was confirmed (the "Confirmed Plan").

The Confirmed Plan substantively consolidated the Debtors, and appointed PENTA Advisory Services as Plan Administrator. The Confirmed Plan defined "Bankruptcy Causes of Action" as:

> All claims, actions, causes of action ... arising under the Bankruptcy Code (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other Entities under sections 506, 510, 543, 544, 545, 547, 548, 549, 500[sic], 551, and 553 of the Bankruptcy Code or otherwise) of the Debtors, the Debtors in Possession, and/or the Post Confirmation Estate (including, but not limited to, those actions identified on Exhibits A, B, and C attached hereto to the extent they constitute Bankruptcy Causes of Action as defined herein) that ... may be instituted by the Plan Administrator[.]

(Confirmed Plan ¶ 1.15, at 2.)

Article XVI of the Confirmed Plan provided:

16.6   Preservation of Rights of Action:

.   .   .   .

16.6.2   In addition, potential Bankruptcy Causes of Action which may be pursued by the Debtors prior to the effective Date and by the Plan Administrator, on behalf of the Post–Confirmation Estate after the Effective Date, are identified on Exhibits A, B, and C attached hereto and also include, without limitation, the following to the extent they are not set forth on the attached Exhibits:

.   .   .   .

Except for the express waiver of certain claims in the Plan, any and all actual or potential avoidance claims pursuant to any applicable section of the Bankruptcy Code, including, without limitation section 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors.

.   .   .   .

Certain potential Causes of Action as to which the Debtors are continuing their investigation of the complete nature, factual basis, and/or legal basis are identified on Exhibit C attached hereto and incorporated herein by reference. The Debtors specifically reserve any Causes of Action that may arise from the factual circumstances described on Exhibit C, in addition to any Causes of Action generally described herein.

.   .   .   .

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights and

Causes of Action that the respective Debtors, or the Post–Confirmation Estate may hold against any Entity, including but not limited to those Bankruptcy Causes of Action . . . shall vest in the Post–Confirmation Estate, and the Plan Administrator, on behalf of the Post–Confirmation Estate, shall retain and may exclusively enforce, as the authorized representative of the Post–Confirmation Estate, any and all such . . . Causes of Action.

(Confirmed Plan ¶ 16.6.2, at 22–3.   *See also* Disclosure Statement ¶ V.E.8, at 62.) [1]

In support of this provision of the Confirmed Plan, the Disclosure Statement provided under the heading "Preservation of Causes of Action:"

The Debtors are currently investigating whether to pursue potential Causes of Action against other Entities. . . . The investigation has not been completed to date, and under the Plan, the Plan Administrator, . . . , retains all rights on behalf of the Debtors and the Post–Confirmation Estate to commence and pursue any and all Bankruptcy Causes of Action . . . discovered in such an investigation to the extent the Plan Administrator, on behalf of the Post–Confirmation Estate, deems appropriate in his reasonable business judgment.

.   .   .   .

b.   In addition, potential Bankruptcy Causes of Action which may be pursued by the Debtors prior to the Effective Date and by the Plan Administrator, on behalf of the Post–Confirmation Estate after the Effective Date, also include, without limitation the following:

.   .   .   .

---

1.   "Causes of Action" is defined in the Plan to include Bankruptcy Causes of Action.   Plan at ¶ 1.22.

Except for the express waiver of certain claims in the Plan, any and all actual or potential avoidance claims pursuant to any applicable section of the Bankruptcy Code, including, without limitation sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors.

(Disclosure Statement ¶ V.E.8, at 59–60.)

The Exhibit A referenced in Confirmed Plan ¶ 16.6.2 reasserts the reservation of preference actions "arising from any transaction involving or concerning the Debtors relating to the Persons and Entities set forth in Exhibit A–1 and the specific payments received by such Persons or Entities during the statutory preference period, as identified on Exhibit A–1." (Pl.'s Amd. Resp. Ex. 1.)

The liquidation analysis attached to the Debtors' Disclosure Statement included a line item under "Non-cash Assets" for "Preference Actions," and assigned a value between $0 and $100,000.00 to such actions. The Disclosure Statement noted: "It is impossible to predict with any degree of certainty the range of recoveries available to General Unsecured Claimants due to the speculative nature of the Bankruptcy Causes of Action.... Accordingly, recoveries on account of Allowed Unsecured Claims may realistically be as low as zero." (Disclosure Statement ¶ V.C.9.c, at 47.) The Disclosure Statement further explained that proceeds from Bankruptcy Causes of Action "are speculative and uncertain and therefore no value has been assigned to such recoveries. The Debtors and the Post–Confirmation Estate do not intend, and it should not be assumed that because any existing or potential Bankruptcy Causes of Action ... have not yet been pursued by the Debtors or are not

set forth herein, that any such Bankruptcy Causes of action ... have been waived." (Disclosure Statement ¶ V.E.8.b, at 61.)

The Disclosure Statement explains that the Plan Administrator will be granted authority to pursue Causes of Action, which included Bankruptcy Causes of Action, for the benefit of the estate. (Disclosure Statement ¶ II.A (Description of Property to be Distributed under the Plan), ¶ V.E.3 (Provisions Governing Plan Implementation; Powers and Duties of the Plan Administrator).)

On October 31, 2003, the Plan Administrator filed over 200 adversary proceedings to avoid prepetition transfers as preferential under 11 U.S.C. § 547(b). This action against Lawson seeks to avoid an $80,000 payment in connection with a contract to provide software to PRG.

PRG and Lawson entered into a Software End User Agreement no later than October 9, 2001.[2] The Agreement required payments by PRG totaling $308,692.88. Lawson was required to deliver the software and documentation "after receipt of the down payment of the license fees." An order form attached to the Agreement indicated that the required down payment was $80,000.54, followed by installment payments of the balance of the contract price over the next four months.

PRG tendered the down payment by check dated October 8, 2001. This check was mailed to Lawson and cleared PRG's bank account on October 12, 2001. The date on which Lawson received the check and the date on which Lawson delivered the software are not revealed in the summary judgment papers. The affidavit of William Corn, accounts receivable manager for Lawson, states, "[t]he software was

---

**2.** The Agreement exhibited by the parties was signed for PRG on October 2, 2001 and for

Lawson Software, Inc. on October 9, 2001. (Pate Aff. Ex. 1; Corn Aff. Ex. A.)

686

not provided until after the debtor paid the money ($80,000) at issue in this case." (Corn Aff. ¶ 4.) Under the Agreement, PRG was responsible, at its own expense, for the installation of the software, user training, data conversion and other services.

Two issues remain for resolution on summary judgment: 1) Subsequent new value under 11 U.S.C. § 547(c)(4); and 2) res judicata and judicial estoppel. Lawson argues that delivery of software after PRG made the $80,000 down payment satisfies the subsequent new value defense in § 547(c)(4). Alternatively, Lawson argues that the Confirmed Plan did not overcome the preclusive effect of confirmation with respect to this preference action.

Plaintiff responds that there are disputed facts with respect to new value and that § 1123(b)(3) was satisfied by preservation language in the Confirmed Plan and Disclosure Statement. Plaintiff offered affidavits of Jeff Pate, former CFO of PRG, and Marylee Robinson, senior consultant for the Plan Administrator.

## II. Analysis

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989). The court is not to " 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.' " *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). All inferences are drawn in the light most favorable to the nonmoving party. *Spradlin v. Jarvis (In re Tri–City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir.2003) (citations omitted). The party opposing a motion for summary judgment, however, " 'may not rest upon mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' " *In re Tri–City Turf Club, Inc.*, 323 F.3d at 442–43 (internal citations and quotations omitted). *See also Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate.' " *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir.1998)).

### B. Subsequent New Value

Section 547(c)(4) is short-handedly referred to as the subsequent advance excep-

tion to preference recovery. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 706 F.2d 171, 172 (6th Cir.), *cert. denied,* 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). This statutory defense provides:

(c) The trustee may not avoid under this section a transfer—

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4).

■ The logic of this defense is that an otherwise preferential transfer is not avoidable to the extent that, after the transfer, the creditor gave the debtor "new value" in a form that replenished the estate. Replenishing the estate for purposes of the § 547(c)(4) defense has several facets. Fundamentally, the estate must receive "new value" defined by § 547(a)(2) as follows:

(a) In this section—

. . . .

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debt-

or or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

In addition, the new value given after the preferential transfer must not be secured by an unavoidable security interest. 11 U.S.C. § 547(c)(4)(A). This makes sense because the estate would not be enhanced if the new value given after the preferential transfer is subject to liens and would not be available to balance the loss caused by the preferential transfer.

■ Also, the new value must not have been paid for by the debtor with a transfer that cannot itself be avoided. 11 U.S.C. § 547(c)(4)(B). In other words, the new value must remain an enhancement of the estate notwithstanding transfers (typically payments) to the creditor by the debtor after the new value was given. A payment by the debtor to the creditor after the creditor gave new value does not unravel the defense if the payment can itself be recovered as an avoidable transfer.

In their briefs, both parties assume that the delivery of the software—Lawson's contractual obligation once the Debtor paid the $80,000—can be "new value" for purposes of the defense in § 547(c)(4). Also, a skirmish with respect to whether the $80,000 payment was on account of an antecedent debt evaporated at oral argument when counsel for Lawson conceded that a binding contract requiring PRG to pay for the software came into existence before the $80,000 was paid to Lawson.[3]

---

3. Lawson originally also sought summary judgment on the issue whether the payment was made on account of an antecedent debt under 11 U.S.C. § 547(b)(2). A separate order that addressed only that issue was entered November 2, 2004. The Joint Stipulation of Contested Legal Issues includes defenses raised by Lawson under § 547(c)(1), contem-

poraneous exchange for new value, and § 547(c)(2), ordinary course of business. Lawson did not move for summary judgment on these other defenses. A timing issue left hanging by the parties on summary judgment is the question whether the new value was given "after" the challenged transfer, as required by § 547(c)(4). Because the transfer

The only element of the § 547(c)(4) defense briefed and argued by the parties is the dispute whether the software had value.

■ The Defendant's motion for summary judgment fails because the "value" of the software is disputed and value is material for § 547(c)(4) purposes. Value for § 547(c)(4) purposes is a question of fact. *See, e.g., Shodeen v. Airline Software, Inc. (In re Accessair, Inc.),* 314 B.R. 386, 395–96 (8th Cir. BAP 2004) (creditor's evidence insufficient to establish that it delivered and installed software that provided new value to debtor); *Claybrook v. Pizza, Inc. (In re Discovery Zone, Inc.),* 300 B.R. 856, 860–61 (Bankr.D.Del.2003) (value of licensing fees). Goods and services delivered to the debtor may or may not have "value" for (c)(4) purposes when there is conflicting evidence whether the goods or services enhanced the estate in money or moneys worth. *See Official Plan Committee of Omniplex Communications Group, L.L.C. v. GE Capital Corp. (In re Omniplex Communications Group, L.L.C.),* 297 B.R. 573, 576 (Bankr.E.D.Mo.2003) (" '[T]he relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate.' ") (citation omitted); *see also Peltz v. Application Eng'g Group, Inc. (In re Bridge Info. Sys., Inc.),* 287 B.R. 258, 267 (Bankr. E.D.Mo.2002) (additional fee levied by creditor "without providing corresponding

value to the debtor does not constitute 'new value' for purposes of § 547(c)(4).")

■ Lawson argues the value of the software was at least what the Debtor agreed to pay for it—more than $300,000 over a period of months. The Pate Affidavit declares that the Debtor did not install or use the software thus, the software had no value to the Debtor. The question whether delivery of the software enhanced or returned value to the estate is fundamental to whether the Debtor realized new value for § 547(c)(4) purposes. The § 547(c)(4) defense cannot be resolved on the conflicting evidence of value on summary judgment.

## C. Res Judicata and Judicial Estoppel

Lawson asserts that "[t]he Debtors' use of a general retention clause in its Disclosure Statement and Plan did not preserve the pending cause of action against Lawson; therefore, the Plaintiffs [sic] are precluded by the doctrines of res judicata and judicial estoppel from asserting their potential claim now." Plaintiff responds that the preference retention provisions of the Confirmed Plan and Disclosure Statement satisfy the standard established by this court's recent decision in *Elk Horn Coal Co., LLC v. Conveyor Manufacturing & Supply, Inc. (In re Pen Holdings, Inc.),* 316 B.R. 495 (Bankr.M.D.Tenn.2004).

---

of the $80,000 was by check, for § 547(c)(4) purposes that transfer occurred when the check was *received* by Lawson. *See Brown v. Shell Canada Limited (In re Tennessee Chemical Co.),* 112 F.3d 234 (6th Cir.1997) (Date of receipt applies to check payments for purposes of new value exception.). In contrast, a transfer by check occurs when the check is honored by the debtor's bank for purposes of § 547(b). *See Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The affidavits submitted on this motion for summary judgment do not reveal when the

$80,000 check was *received* by Lawson. The Corn and Pate Affidavits provide undisputed evidence of when the check is dated (October 8) and when the check cleared PRG's bank account (October 12), but neither affidavit states when the check was received by Lawson or what date Lawson delivered the software to PRG. Again, the parties seem to have assumed for purposes of summary judgment that the $80,000 check was received before Lawson provided the software for purposes of the § 547(c)(4) defense.

■ As explained in *Pen Holdings*, confirmation of a Chapter 11 plan can be preclusive of trustee or debtor-in-possession avoidance actions on principles of res judicata. Preclusion can be prevented by providing in the plan for the preservation of avoidance actions. This power of preservation is codified in 11 U.S.C. § 1123(b)(3).[4] The issue addressed in *Pen Holdings* and raised here is whether the language of the Confirmed Plan is sufficient to overcome the res judicata effect of confirmation with respect to this preference action.

■ In *Pen Holdings*, after reviewing the history of 11 U.S.C. § 1123(b)(3), this court concluded that "the notice at issue in § 1123(b)(3) is not notice to potential defendants, it is notice to creditors generally that there are assets yet to be liquidated that are being preserved for prosecution by the reorganized debtor or its designee." *Pen Holdings*, 316 B.R. at 501. Considering Sixth Circuit precedent, in the context of the history of § 1123(b)(3) and acknowledging conflicting lower court decisions, this court concluded that the Sixth Circuit has

> not establish[ed] a general rule that naming each defendant or stating the factual basis for each cause of action are the only ways to preserve a cause of action at confirmation of a Chapter 11 plan. Read in the context of its history, § 1123(b)(3) protects the estate from loss of potential assets. It is not designed to protect defendants from unexpected lawsuits. The words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particu-

lar claims at issue: Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?

*Id.* at 504.

■ Application of this standard yields a clearer case than *Pen Holdings*. As detailed above, the Confirmed Plan, Disclosure Statement and exhibits repeatedly reserve Bankruptcy Causes of Action, defined to include preference actions under § 547. The references to preference litigation are not concealed as retention of jurisdiction provisions, are not ambiguously worded and specifically reference § 1123(b)(3) of the Code. That preference actions would be assets of the Post–Confirmation Estate, to be investigated and prosecuted by the Plan Administrator, is plainly set forth in the Confirmed Plan and Disclosure Statement. Potential preference recovery—admittedly speculative— was included in the liquidation analysis. Debtors went further than a general reservation of preference actions and attached exhibits to the Disclosure Statement and Confirmed Plan that listed, to the extent then possible, creditors to whom payments were made during the preference period. Creditors were able to identify and evaluate the estate's assets—including preference actions under § 547—through the disclosures and reservations contained in the Confirmed Plan and Disclosure Statement.

■ Judicial estoppel is stated but not separately argued by the Defendant. Judicial estoppel sometimes functions simi-

---

4. 11 U.S.C. § 1123(b)(3) provides:

(b) Subject to subsection (a) of this section, a plan may—

. . . .

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representatives of the estate appointed for such purpose, of any such claim or interest.

larly but, of course, is not the same concept as res judicata. "The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy,* 283 F.3d at 775 (quoting *Teledyne Indus., Inc. v. NLRB,* 911 F.2d 1214, 1218 (6th Cir.1990)). This doctrine "is utilized in order to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Id.* at 776 (quoting *Teledyne Indus., Inc. v. NLRB,* 911 F.2d at 1218).

 By including judicial estoppel as a theory on summary judgment, Lawson must be saying that the Debtors took an inconsistent position with respect to the existence (or value?) of this preference action before and after confirmation of the plan. Lawson does not cite or give example of the preconfirmation assertion by the Debtors with respect to this preference action necessary to form the predicate for its judicial estoppel argument. Perhaps Lawson means to make the same argument as it makes with respect to res judicata: The Confirmed Plan and Disclosure Statement failed to identify preference actions as assets of the estate; therefore, it is inconsistent (for judicial estoppel purposes) for the Debtor to now seek to prosecute such an action against Lawson.

As explained above, the Confirmed Plan and Disclosure Statement quite adequately identify and preserve preference actions for investigation and litigation by the Plan Administrator after confirmation. Accordingly, Lawson's judicial estoppel argument fails on summary judgment because there is no inconsistent preconfirmation position on which to bottom the theory.

## III. Conclusion

Lawson's Motion for Summary Judgment will be denied by separate order.

## ORDER

For the reasons stated in the memorandum filed contemporaneously herewith, IT IS ORDERED, ADJUDGED and DECREED that the Defendant's motion for summary judgment is DENIED.