IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 98-20592

———————————————

In The Matter of: MICRO INNOVATIONS CORPORATION,

Debtor.

* * * * * * * * * *

RANDY W. WILLIAMS, Trustee,

Appellee,

versus

AGAMA SYSTEMS, INCORPORATED,

Appellant.

———————————————

Appeal from the United States District Court for the
Southern District of Texas

———————————————

August 13, 1999

Before GARWOOD, DUHÉ and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Agama Systems, Inc. (Agama) challenges the decision of the bankruptcy court, subsequently affirmed by the district court, allowing appellee Randy Williams—the trustee for the debtor Micro Innovations Corp. (MIC)—to recover as avoidable preferences $313,292 of payments made by MIC to Agama during the ninety-day period preceding MIC's filing of a petition in bankruptcy. Agama argues that it advanced new value to MIC subsequent to most of the

claimed preferences, and is entitled under the Bankruptcy Code, 11 U.S.C. 101, *et seq*., to offset the value of these shipments against the preferences. *See* 11 U.S.C. § 547(c)(4). We agree and reverse the judgments of the courts below.

### Facts and Proceedings Below

The relevant facts in this case are not in dispute. Agama is a computer parts wholesaler that supplied components to MIC. During the 90-day period preceding MIC's filing of its bankruptcy petition, Agama made 54 separate deliveries of components to MIC valued at the time of sale at $279,905. In return, it received 49 MIC checks totaling $313,292. The parties have stipulated as to the timing and value of these transactions. Each transaction was fundamentally similar. Agama would invoice and deliver a shipment and receive a check for the value of that delivery. Each check was post-dated by at least seven days, however, and the check for a particular delivery always cleared after that delivery had been made. Other shipments followed the clearance of most of the checks, however. Agama's invoices that accompanied shipments also stated that "Agama Systems sustains [sic] [a] security interest on the merchandise stated above." However, Agama never took the necessary steps to perfect its security interest in the delivered goods. During the ninety-day period, Agama monitored MIC's cash flow and at one point obtained information about MIC's finances without its consent.

MIC initiated bankruptcy proceedings under Chapter 7 on June 6, 1995. Thereafter, the trustee, Randy Williams, initiated this

adversary proceeding against Agama to recover as preferences under 11 U.S.C. § 547(b) the payments made by MIC during the ninety-day pre-filing period. After a trial, the bankruptcy judge determined that the trustee could recover the full value of all payments made during the ninety-day period. The bankruptcy court amended the judgment to clarify Agama's liability for prejudgment interest. Agama appealed to the district court, which affirmed in a memorandum opinion and order filed June 10, 1998. This appeal followed.

## Discussion

When a supplier provides goods and services to a buyer before he receives payment for those goods, he is engaging in a credit transaction.[1] When a supplier demands payment before he ships goods and services, he is engaging in a prepayment transaction. When a supplier demands payment in cash at the same time that he releases goods, he is engaging in a cash and carry transaction. We must begin our analysis with these simple definitions because the position the trustee maintains here in essence means that a section of the bankruptcy code designed to protect creditors who engage in credit transactions can only be invoked by a creditor who engages in cash and carry and prepayment transactions. The trustee also in effect maintains that an extinguished security interest must be treated as a live security interest for the purpose of allowing him

---

[1] The parties stipulated that for all relevant purposes a payment was made by MIC and received by Agama when MIC's check cleared its drawee bank. *See Barnhill v. Johnson*, 112 S.Ct. 1386 (1992).

to recover payment, but as an extinguished security interest for the purpose of allowing him to maintain possession of the collateral. The bankruptcy court and the district court followed the trustee's logic. We cannot, and reverse.

I. Subsequent Advance

The bankruptcy code allows a trustee to recover certain payments made by the debtor in the ninety-day pre-filing period as preferences. A recipient of such payments may invoke several defenses to block the trustee from recovery, however. One of these defenses has become known as the subsequent advance rule. See 11 U.S.C. § 547(c)(4).[2] In *In re Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1091 (5th Cir. 1994), we examined section 547(c)(4). The creditor in *In re Toyota*, over the course of several months, extended three loans to the debtor. Each loan was repaid. The bankruptcy trustee for the debtor then attempted to recover as avoidable preferences each of the three loan repayments. We rejected this attempt, but allowed the trustee to recapture the

---

[2]    In pertinent part, 11 U.S.C. § 547(c)(4) states:

"(c) The trustee may not avoid under this section a transfer—

. . .

    (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

        (A) not secured by an otherwise unavoidable security interest; and
        (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; . . ."

4

last repayment as a preference. We reasoned that the first two repayments had been followed by the extension of new value, in the form of new and separate loans, of greater value than the repayment they followed. The last repayment, however, was not followed by the extension of a new loan, and thus new value. There was therefore no subsequent advance of new value available for offset of the last repayment, and that repayment was fully recoverable.

*In re Toyota* involved a credit transaction. To be more precise, it involved a revolving credit arrangement in which new loans were extended after the old loans were paid off. We noted there that it was precisely these kinds of arrangements that the Bankruptcy Code seeks to protect. Two policy justifications lie behind this result. First, by limiting the risk of loss incurred by suppliers who continue ordinary credit arrangements with troubled companies, the rule encourages transactions that may allow the debtor to stave off bankruptcy. Second, the protection provided by the section does not materially harm the other creditors, since the requirement that an advance be followed by an extension of new value insures that any injury to the estate is followed by a subsequent addition to the estate. *See In re Toyota*, 14 F.3d at 1091. *See also In re Kroh Brothers Development Co.*, 930 F.2d 648, 651, 654 (8th Cir. 1991).

Here, the parties also engaged in a series of credit transactions. Agama shipped components to MIC, knowing that payment for those goods would be received later (if at all). The trustee maintains, and the courts below agreed, that in and of

5

itself this structure defeats the application of section 547(c)(4). They argue that in every individual transaction, the new value (the components) was received before making the payment (which occurred when the post-dated checks cleared the drawee bank) matched to *those particular goods*. The extension of new value thus always *preceded* the individual preference transfer, rather than being "after such transfer" as the section 547(c)(4) exception requires. This argument, while ingeniously simple, is directly contradictory to our reasoning in *In re Toyota*. Looked at as individual, separate transactions, each loan in *In re Toyota* preceded the repayment of that particular loan. The fact that the new loan extended "after such transfer" was part of an entirely different loan transaction did not prevent us from shielding the prior repayment from recovery by matching it with the new value provided by the next, unconnected loan. Other circuits have similarly assumed that an extension of new value need not be directly connected to the preceding preference in order to shelter it. *See In re Meredith Manor, Inc.*, 902 F.2d 257, 258-59 (4th Cir. 1990) (string of advances under line of credit allowed to shield prior repayment preferences without discussing lack of any apparent link between the amounts); *In re IRFM*, Inc., 52 F.3d 228, 229, 233 (9th Cir. 1995) (supplier entitled to retain all preferences even though payment for a particular shipment followed that shipment).

It could hardly be otherwise, since if we applied the trustee's reasoning to the facts of *In re Toyota* we would be left with the odd result that a creditor could only retain a loan

6

repayment made by a financially troubled debtor if he received repayment of the loan prior to actually extending the loan.  Only then would the new value loan, on a single transaction basis, be received "after such transfer" in the manner the trustee maintains section 547(c)(4) requires.  But a loan that one must prepay or repay simultaneously is of little apparent utility.  Applied generally, the trustee's rule would have only slightly less odd results.  Creditors would be protected from preference recovery only to the extent that they eschewed credit transactions entirely. If they dared to ship goods before receiving cash in hand, they would run the risk of a court breaking their transactions down as was done below, and thus deciding that the very extension of revolving credit that courts have unanimously found is the chief intended recipient of the statute's protection is fatal to its case.  This would hardly encourage suppliers to engage in a significant type of ordinary business credit transactions that might help troubled companies avoid bankruptcy, which we have identified as a primary goal of the statute.  Neither the courts below nor the trustee have cited any authority for this novel and counterintuitive reading of the statute, and we reject it.

Our rejection of the trustee's proposed reading of the statute does not resurrect the old net result rule, as he claims.  Under the net result rule, any and all extensions of value during the preference period were available to be offset against all of the preferences.  Thus in *In re Toyota* under the net result rule we would have simply totaled the new value and subtracted it from the

total loan repayments. Instead we looked at each individual repayment preference to see if it was followed by the extension of a new loan. Since the last repayment was not, that repayment could be avoided regardless of excess new value the creditor had advanced prior to that repayment. Similarly, here Agama does not—and cannot—argue that it may retain any portion of the preference payments represented by checks that cleared after the last shipment of new value was received, although under the old rule such payments might have been offset against any sufficient prior extensions of value. All that we have done here is read the plain language of the statute in light of its manifest purpose, shielding payments to the extent that thereafter Agama extended new value to the estate.

In order to avoid the obvious implications of *In re Toyota*, the trustee attempts to focus our attention on the fact that post-dated checks were used in the transactions. In particular, he focuses on two cases that have discussed post-dated checks in the avoidance context. Both are readily distinguishable. In *In re New York City Shoes*, 880 F.2d 679 (3d Cir. 1989), a company with a standard revolving credit arrangement with the debtor refused to ship more goods until payment. The debtor then paid for the *prior* shipment with a post-dated check. Before this check cleared or the date that it bore was reached, the company shipped more goods. That was its last shipment. No other payments were involved and the last shipment was never paid for. The debtor then attempted to recover the amount of the post-dated check as a preference. The

8

*City Shoes* court held that section 547(c)(4) did not shield the payment, since payment of the post-dated check should be considered as occurring when the check actually cleared or when the date which it bore arrived, not when the check was received by the creditor. Accordingly, there was no extension of new value that followed the challenged payment and thus nothing that could be set off against it under the statute. *Id.* at 685. In substantially similar circumstances, a supplier released a shipment of goods upon receipt of a series of post-dated checks that covered a prior shipment. Following *City Shoes*, the court found that when the date the checks bore arrived and the checks cleared after the extension of new value was received, the new value could not be applied against the last sequence of checks under section 547(c)(4). *See In re Samar Fashions, Inc.*, 109 B.R. 136, 138 (Bank. E.D. Pa. 1990).

Both *City Shoes* and *Samar* are fully in keeping with our approach to section 547(c)(4) here. Once those courts clarified that the post-dated check payment fell on the date the check bore or cleared, and not on its delivery, it was clear that the challenged preferences followed the last possible new value that the creditor might seek to use to shield what would otherwise be an avoidable preference. Just as we did not allow the creditor in *In re Toyota* to retain the last loan repayment, and just as Agama here does not claim that it is entitled to retain the last series of payments it received, the *City Shoes* and *Samar* courts merely insured that the final payment by the debtor could be recovered. These cases do not establish some unique rule barring invocation of

section 547(c)(4) by those creditors who accept post-dated checks. Rather, they establish when a post-dated check can be considered paid for the purposes of applying the standard statutory analysis. Since under this rule the check payments followed the new value, section 547(c)(4) could not be invoked. Here, in contrast, several extensions of new value occurred after the post-dated check payments were made, the payment dates all being based on the stipulation of the parties (note 1, *supra*). It is fully consistent with these cases' reasoning and our precedent to allow the new value to be applied against such preceding preferences.

The *City Shoes* court did state that "postdating checks is not business as usual." *City Shoes*, 880 F.2d at 683. This statement, however, was made in the context of the court's assumption that where the debtor pays by a currently dated check the debtor's payment for purposes of section 547(c)(4) is made when "the check is delivered to the creditor," and only as a basis for the court's holding that, in contrast, when the debtor pays by post-dated check payment is not made when the check is delivered but rather when the date on the face of the check arrives or when the check clears the drawee bank. *Id*. at 683-84.[3] That is not at issue here, as the parties have stipulated that the relevant transfers or payments by MIC occurred, with respect to each check, when that check cleared the drawee bank (see note 1, *supra*). We attach no other significance to the "not business as usual" language of *City Shoes*.

---

[3]    We note that *City Shoes* was handed down before *Burnhill v. Johnson*, 112 S.Ct. 1386 (1992).

10

Here, Agama, by accepting post-dated checks, exposed itself to the risk that the check would be dishonored and thus that at least its current shipment would not be paid for.  To be sure, by the way it actually operated under this credit structure—on several occasions multiple shipments were delivered before a check given for an earlier shipment had cleared—Agama in fact some times exposed itself to the risk of more than one shipment.  However, as part of an ongoing, prudent credit arrangement such an exposure is not unusual, or preclusive of the application of section 547(c)(4).  *See Meredith Manor*, 902 F.2d at 258-59 (applying section 547(c)(4) to a line of credit arrangement in which several independent advances followed each periodic payment).  Here, Agama used the post-dated check mechanism to limit its risk to a set window in time, rather than a single shipment.  Since shipments would presumably stop as soon as a check was dishonored, its risk was limited to the number of shipments made during the post-dating delay.  Nothing in this credit structure takes the creditor out of the protection of section 547(c)(4).[4]

---

[4]    A distinction based on the number of shipments outstanding at any given time would serve no useful purpose.  In this context, there is no reason to treat a creditor who is at risk for several smaller shipments differently from one at risk for fewer, larger shipments.

The trustee also attempts to paint a picture of nefarious behavior by Agama, claiming that this inequitable conduct precludes application of the new value defense.  In particular, the trustee professes outrage that Agama monitored MIC's cash flow and obtained information about its bank account balance.  Caution on the part of lenders dealing with troubled companies is not unusual.  Without endorsing the specific conduct complained of, we find its general pattern cannot preclude Agama's recourse to section 547(c)(4).

II. "Otherwise Unavoidable" Security Interest

Section 547(c)(4) does not allow all extensions of new value to be offset against prior preferences.  Only new value that is "not secured by an otherwise unavoidable security interest" may be used.  Section 547(c)(4)(A).  Here, Agama retained a security interest in the new value goods at the time of shipment.  However, it is undisputed that Agama never took any action to perfect its security interests.  These unperfected security interests could not be, and were not, enforced by Agama.  Moreover, subsequent payment by MIC would also bar enforcement of the security interests under Texas law.  *See, e.g., Barr v. White Oak State Bank*, 677 S.W.2d 707, 710 (Tex.App.--Tyler 1984, writ ref'd).  The trustee nevertheless argues, and the courts below agreed, that Agama may not invoke section 547(c)(4) because at one time it reserved a security interest.  It concedes that this security interest is not enforceable, but reads the statute to require that for an extension of new value to be available for set off, any security interest attached to it must be subject to the trustee's avoidance power. The argument is that since the security interests here were in fact extinguished by payment (the payment asserted as a preference), not by the actual operation of the avoidance powers, the security interests were "unavoidable" and the shipments which were subject thereto can not constitute new value applicable against prior preferences.

The trustee's argument necessarily assumes that Congress was concerned with the mere existence, at any time, of security

12

interests, rather than their enforcement and subsequent diminishing of the estate. However, the text of the statute indicates clearly that this is not the case. The statute concerns itself not with all security interests, but only with "otherwise unavoidable" security interests. This indicates that the proper temporal focus is not on the historical existence of security interests, but rather the existence of such interests at the time of bankruptcy. If security interests exist at that time and the new value rule is invoked, the court should not allow the thus secured new value to be set off against past preferences if the security interests are otherwise unavoidable. However, if at the time of bankruptcy no such interest exists, the once secured new value may be applied against such preferences. Since no security interest existed at the relevant time, section 547(c)(4)(A) is facially inapplicable.

This interpretation of the statute is the only sensible, real world result. A key justification for the new value exception is that while the payment of preferences to the creditor diminished the estate, other creditors are not really worse off since the subsequent advance of new value replenishes the estate. *See In re Toyota*, 14 F.3d at 1091. This logic is obviously undercut if the creditor retains a valid, enforceable security interest in the new value. If section 547(c)(4)(A) did not exist, such a creditor could not only shield a past preference, but also enforce the security interest and recover the new value. The net effect on the estate would no longer be neutral, and the other creditors would have cause for complaint. But if the security interest originally

13

attached to the new value is unenforceable—either because it has been extinguished or is avoidable—the mere fact it once existed cannot disadvantage the other creditors. The new value remains firmly fixed in the estate and available to all the creditors. There thus is really no reason to prevent the set-off of this new value against prior preferences. *See Kroh Brothers*, 930 F.2d at 654 (stating that the availability of section 547(c)(4) "depends on the ultimate effect on the estate" and thus if a party could assert a secured claim against the estate the defense could not be invoked). Neither the trustee nor the courts below cite any case in which the prior existence of a security interest that was not capable of being asserted against the estate was relied on to defeat invocation of section 547(c)(4)'s protection. We therefore hold that section 547(c)(4)(A) prevents the application of new value against prior preferences only if that new value is subject to a security interest that is valid and enforceable at the time of the bankruptcy.

III. Method of Calculation

Since we conclude that section 547(c)(4) applies here, the only remaining question is the method which should be used to calculate the amount of preferences as reduced by the allowable new value. Two approaches have arisen. The first, majority, rule allows a given extension of new value to be applied against any preceding preference. Thus, for example, where two or more successive preferences are followed by the initial extension of new value and it is in an amount larger than the most recent of the

14

prior preferences, the excess may be applied to shield the earlier preference (or preferences) to the extent that such excess is not larger than the total value of all such earlier preferences (similarly, a large preference payment may "carry over" past one subsequent small extension of new value and ultimately be fully sheltered by one or more still later extensions of new value). *See, e.g., in re Thomas Garland, Inc.*, 19 B.R. 920 (Bank. E.D. Mo. 1982).[5] The minority rule allows a given extension of new value to be applied only to the immediately preceding preference, so that, for example, if two or more successive preferences are followed by the first extension of new value and it is in an amount larger than the most recent of the prior preferences, then all that excess is always recoverable by the trustee. *See Leathers v. Prime Leathers Finishers Co.*, 40 B.R. 248 (D. Maine 1984). According to the parties, under the *Garland* rule the trustee may recover some

---

[5] The trustee mischaracterizes the *Garland* rule in his brief as allowing creditors to "obtain an offset for new value advanced prior to a given preferential payment." That is not what *Garland*, the cases adopting it, or our decision here allows. Under the express terms of the statute, a given extension of new value may never be applied to offset a subsequent preference. The *Garland* rule allows prior *preferences* to be carried forward and offset against extensions of new value that followed them. It does not allow *new value* to be carried forward and offset against later preferences. Some of the language in *Meredith Manor* implies that the district court allowed the offset of the last preference payment by prior as well as latter extensions of new value. However, the court specifically indicated that this was an incorrect approach. *See Meredith Manor*, 902 F.2d at 259 (creditor may apply new value against "the immediately preceding preference as well as against all *prior* preferences"(emphasis added)). The court's decision to affirm in the face of this apparent error must be viewed as linked to the fact that the difference between the proper *Garland* approach and the district court's calculations given the history of payment was only eight dollars.

15

$33,368 of the check payments as preferences. Usage of the *Leathers* rule would increase the trustee's recovery to approximately $157,393.

Both circuit courts that have addressed the question have embraced the *Garland* rule and rejected *Leathers*. *See Meredith Manor*, 902 F.2d at 259; *In re IRFM,* 52 F.3d at 233. The language of section 547(c)(4) purports to shield all preferences to the extent of subsequent new value (not disqualified under clauses (A) or (B)) and nothing in its language purports to limit the amount of such new value shield by the amount of the most recent of multiple prior preferences. Moreover, as the Ninth Circuit has highlighted, the *Garland* rule furthers section 547(c)(4)'s goal of encouraging creditors to continue to deal with troubled companies. Creditors "will be more likely to continue to advance new value to a debtor if all these subsequent advances may be used to offset a prior preference." *In re IRFM,* 52 F.3d at 233. We join our sister circuits and hold that *Garland* articulates the proper method for calculating recoverable preferences when section 547(c)(4) applies. On remand, the district court should calculate the trustee's recovery accordingly.

## Conclusion

For the reasons stated, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED

16