In re INTERCONTINENTAL POLYMERS, INC., Debtor.

Intercontinental Polymers, Inc., Plaintiff,

v.

Equistar Chemicals, LP, Defendant.

Bankruptcy No. 03–23736.
Adversary No. 04–2016.

United States Bankruptcy Court, E.D. Tennessee.

March 31, 2005.

Mark S. Dessauer, Hunter, Smith & Davis, LLP, Kingsport, TN, for Intercontinental Polymers, Inc.

Mark S. Finkelstein, Shannon, Martin, Finkelstein and Sayre PC, Houston, TX, Robert L. Arrington, Wilson Worley Moore Gamble & Stout PC, Kingsport, TN, for Equistar Chemicals, LP.

## MEMORANDUM

MARCIA PHILLIPS PARSONS, Bankruptcy Judge.

This preference action is before the court on the parties' cross-motions for summary judgment. This court having concluded that the transfers are excepted from avoidance under 11 U.S.C. § 547(c)(4) except to the extent of $8,558.87, the motions will be granted in part and denied in part. This is a core proceeding. *See* 28 U.S.C. 157(b)(2)(F).

### I.

The debtor Intercontinental Polymers, Inc. ("IPI") filed chapter 11 on October 20, 2003, and on April 7, 2004, IPI commenced the present adversary proceeding against Equistar Chemicals, LP ("Equistar"). As set forth in the complaint, prior to its bankruptcy filing IPI was engaged in the business of the manufacture and sale of polymers and fibers. As part of its polymer manufacturing process, IPI purchased certain raw materials in the form of monoethylene glycol polyester ("Product")

from Equistar. During the ninety-day preference period preceding the bankruptcy, IPI made payments totaling $380,755.40 to Equistar. According to IPI, these payments constitute preferential transfers avoidable and recoverable under 11 U.S.C. §§ 547(b) and 550. In its answer, Equistar denies that the payments were preferences and raises the § 547(c) defenses of contemporaneous exchange, ordinary course of business, and subsequent new value. *See* 11 U.S.C. § 547(c)(1), (2), and (4).

On November 5, 2004, Equistar moved for summary judgment, asserting that the transfers are fully protected from recovery by the new value defense set forth in § 547(c)(4) because Equistar shipped new Product to IPI after each of the alleged preferential transfers. Alternatively, Equistar asserts that IPI will be unable to establish the third and fifth elements of a preference, that IPI was insolvent at the time of the transfers and that the transfers enabled Equistar to receive more than it would have otherwise received if this case were a chapter 7 because Equistar held a perfected security interest when the transfers were made. *See* 11 U.S.C. § 547(b)(3) and (5).

On December 1, 2004, IPI filed a response in opposition to Equistar's motion for summary judgment and a cross-motion for summary judgment on all elements of its preference claim under § 547(b) and on all § 547(c) defenses pled by Equistar. Subsequently, on December 30, 2004, Equistar filed a response in opposition to IPI's cross-motion for summary judgment, wherein it maintained its position regarding § 547(b)(3) and (5) and § 547(c)(4), but did not challenge IPI's request for summary judgment on the remaining elements of a preference and Equistar's contemporaneous exchange and ordinary course of business defenses under § 547(c)(1) and

(2). Noting this omission, IPI filed a reply on January 10, 2005, requesting that the court deny or strike these defenses as a matter of law based on E.D. Tenn. LBR 7007–1 which provides that a failure to respond to a motion "shall be construed by the court to mean that the respondent does not oppose the relief requested by the motion." Most recently, on January 19, 2005, Equistar filed a surreply which addressed only the § 547(c)(4) issue. From all of the foregoing, it is clear that the issues left for determination are whether the § 547(b)(3) and (5) elements have been established by IPI, and if so, whether Equistar is entitled to the subsequent new value defense under § 547(c)(4).

## II.

Fed.R.Civ.P. 56, as incorporated by Fed. R. Bankr.P. 7056, mandates the entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court is not to " 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Browning v. Levy,* 283 F.3d 761, 769 (6th Cir.2002)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A genuine issue for trial exists only when there is sufficient 'evidence on which the [court] could reasonably find for the plaintiff.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-

moving party to produce evidence that would support a finding in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. In considering the motion, the court must construe all reasonable inferences in favor of the non-moving party. *Spradlin v. Jarvis (In re Tri–City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir.2003). The party opposing a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* at 442–43 (citations omitted). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001)(quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir.1998)).

## III.

Section 547 (b) of the Bankruptcy Code provides as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). IPI has the burden of proving that all of these elements are satisfied. *See* 11 U.S.C. § 547(g).

As previously noted, Equistar does not challenge IPI's assertion that it has established elements (1), (2), and (4) of § 547(b). The documents submitted in support of IPI's motion for summary judgment indicate that during the 90 days preceding its bankruptcy filing. IPI paid sums totaling $380,755.40 to Equistar. Within the meaning of § 547(b), these payments constituted transfers of the debtor's property to a creditor in payment of an antecedent debt,[1] with the exception of a payment of

---

1. With respect to § 547(b)(1), "creditor," as defined by the Bankruptcy Code, means "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" 11 U.S.C. § 101(10)(A). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unse- cured[.]" 11 U.S.C. § 101(5)(A). The pleadings, answers to interrogatories, and affidavits establish that Equistar was a creditor at the time of the transfers because it had a right to payment from the debtor in the form of outstanding invoices. A debt is antecedent if it was incurred prior to the transfer of a debtor's property. *See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 316 (5th Cir.1996). Equistar's

$27,195.84 on August 18, 2003, which IPI admits was a prepayment rather than a payment of a prior debt. Thus, the sum of $353,559.56 is potentially subject to recovery as a preference.[2]

Equistar contends, however, that these payments are not preferential because IPI was not insolvent at the time the transfers were made as required by § 547(b)(3). For purposes of § 547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). This presumption is sufficient to carry IPI's burden of establishing insolvency unless Equistar comes forward with some evidence to rebut the presumption. *See Whittaker v. Citra Trading Corp. (In re Int'l Diamond Exch. Jewelers, Inc.),* 177 B.R. 265, 269 (Bankr. S.D.Ohio 1995). If Equistar introduces such evidence, IPI must satisfy its burden of proving insolvency by a preponderance of the evidence. *See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 34 (2d Cir.1996)(citing *Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1351 (8th Cir.1983)(presumption affords initial benefit but ultimate burden remains on trustee to prove insolvency)).

To rebut the statutory presumption of insolvency, Equistar references the schedules filed by IPI in this bankruptcy case, which indicate assets of $20,864,449.13 and liabilities of $13,029,583. In addition, Equistar argues that the scheduled assets fail to include a potential claim in the amount of $6 million held by IPI against its parent companies. According to Equistar, this claim omission and the representation of solvency preclude IPI from claiming insolvency during the preference period due to the doctrine of judicial estoppel.

In response, IPI submits the affidavit of David Carpenter, its chief financial officer, who states that IPI's assets were scheduled at book value rather than going concern or fair market value. IPI asserts that because insolvency under § 547(b)(3) is a measure of going concern value, its scheduled valuation at book value is irrelevant to a determination of insolvency for preference purposes and insufficient to rebut the insolvency presumption. Furthermore, judicial estoppel is not triggered, argues IPI, because its statement of book value is not inconsistent with its assertion of insolvency under a going concern analysis, citing *Himel v. Cont'l Ill. Nat'l Bank,* 596 F.2d 205, 210–11 (7th Cir.1979)(the doctrine of judicial estoppel is limited to circumstances where clearly inconsistent positions are taken). With regard to the alleged claim against its parent companies, IPI states that it did have a cause of action in the form of a promissory note from its parent companies, but as previously disclosed to all creditors in this case and as approved by the court, it sold this note postpetition for $1.1 million and paid $800,000 of this amount to SouthTrust Bank, the holder of a perfected security interest in the note. IPI contends that this asset is immaterial to the issue of its

---

answers to interrogatories evidence that all transfers were applied to outstanding invoices, with the exception of the $27,300.60 payment made on August 18, 2003. Of this amount, only $104.76 was applied to an antecedent debt; the balance of $27,195.84 was a prepayment.

**2.** In its cross-motion for summary judgment, IPI reduced its preference claim from $380,755.40 to $353,664.35, conceding that $27,195.84 of the $27,300.60 payment to Equistar on August 18, 2003 was prepayment for two invoices. According to the court's calculation, however, this adjustment would reduce the preference claim to $353,559.56. This court is unable to determine the basis for the discrepancy.

insolvency and therefore, insufficient to rebut the insolvency presumption.

Alternatively, assuming that Equistar has rebutted the presumption, IPI argues that there is a genuine issue of fact as to insolvency which precludes summary judgment in Equistar's favor. To support this assertion, IPI again references Mr. Carpenter's affidavit, wherein he notes that IPI had ceased its manufacturing operations prior to its bankruptcy filing and opines that the liabilities of IPI exceeded its assets at market or going concern value on the day IPI's bankruptcy petition was filed and on each of the preceding 90 days. IPI also cites its interrogatory responses wherein it stated that the market value of its assets on the dates of the transfers was between $4 million and $6 million.

Under the Bankruptcy Code, a debtor is insolvent when the sum of its debts exceeds its property, "at a fair valuation." *See* 11 U.S.C. § 101(32). Most courts define "fair valuation" to require a debtor's assets to be valued based on a going concern value, unless the debtor is on its "deathbed," in which case liquidation value is used. *See Brown v. Shell Can., Ltd. (In re Tenn. Chem. Co.)*, 143 B.R. 468, 471 (Bankr.E.D.Tenn.1992), *aff'd*, 112 F.3d 234 (6th Cir.1997)("Whether the debtor was solvent or insolvent under the bankruptcy definition depends on the fair value of the debtor's property.").

At least two courts have recognized that a debtor's schedules, while not conclusive proof of insolvency, may rebut the presumption of insolvency. *See In re Tenn. Chem. Co.*, 143 B.R. at 472–73; *see also Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel)*, 96 B.R. 275, 277 (9th Cir. BAP 1989)(bankruptcy court's decision that debtor's initial schedules were sufficient evidence to rebut the presumption of insolvency was not clearly erroneous). The weight of authority, however, deems a debtor's schedules insufficient to rebut the insolvency presumption where the schedules do not accurately reflect asset value. *See Lids Corp. v. Marathon Inves. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 548 (Bankr.D.Del.2002)(finding that the debtor's schedules, based on book value and not market value, were insufficient to rebut the presumption of insolvency); *Miller & Rhoads, Inc. Secured Creditors' Trust v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. 950, 957 (Bankr.E.D.Va.1992)(finding that the debtor's "schedules were materially flawed, especially with regard to the real property values, and that the defendants' reliance on these values is insufficient to overcome the presumption of insolvency"); *Harrison v. Brent Towing Co., Inc. (In re H & S Transp. Co.)*, 110 B.R. 827, 833 (M.D.Tenn. 1990)("[T]he bankruptcy court properly refused to admit the debtor's schedules into evidence inasmuch as it was shown that the figures in that document did not represent the fair value of the debtor's assets."); *W.L. Mead, Inc. v. Cent. States Pension Fund (In re W.L. Mead, Inc.)*, 70 B.R. 651, 655 (Bankr.N.D.Ohio 1986)(finding that evidence of solvency in debtor's schedules is insufficient to overcome presumption of insolvency where a magnitude of discrepancy existed between the scheduled values and the actual sale prices), *quoted in Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.)*, 192 B.R. 477, 487–88 (Bankr.N.D.Ill. 1996); *Lawrence v. B & M Plastics, Inc. (In re Luster–Coate Metallizing Corp.)*, No. 01–22764, 2004 WL 432038, at *6 (Bankr.W.D.N.Y. Feb.3, 2004)(finding that schedules not accurately setting forth the fair value of debtor's assets were insufficient to rebut the presumption of insolvency).

■ It is undisputed that the schedules in this case were prepared utilizing book

value rather than fair market or going concern value. David Carpenter, who was CFO of IPI from March 1999 to May 2004 and currently maintains IPI's books and records, states in his affidavit that he prepared the schedules of assets and liabilities filed in IPI's bankruptcy, that the scheduled values for the equipment and machinery were based on cost less depreciation, and that the scheduled value for the inventory was cost. Because book value is not probative of the issue of fair market valuation, the schedules are insufficient to rebut the statutory presumption of insolvency.

■ With regard to the unscheduled claim against IPI's parent, this court similarly finds such evidence insufficient to rebut the presumption. Equistar's proof as to the existence of the asset and its value is derived from a brief filed by SouthTrust Bank in IPI's underlying bankruptcy case, wherein the Bank alleged that IPI had a $6 million cause of action against its foreign parent company, Tolaram, a Singapore corporation and against ASEAN, Tolaram's parent company and a Hong Kong corporation. It is highly questionable whether a representation in a brief constitutes sufficient proof of the asset's value, especially in light of IPI's response that it sold this cause of action postpetition for $1.1 million, after court approval and after all creditors were noticed and failed to object. More importantly, there is no evidence before the court as to the effect that this asset had on IPI's overall balance sheet and whether it was of sufficient value to have rendered IPI otherwise solvent at the time of the preferential transfers. Equistar's speculation that the inclusion of this asset would have increased IPI's margin of solvency by $6 million is insufficient proof to rebut the statutory presumption of insolvency. *See Sharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Edu-*

*cation and Research Foundation)*, 292 B.R. 68, 77 (Bankr.W.D.Pa.2003)("[E]vidence constituting mere speculation as to whether the Debtors were insolvent is not sufficient to rebut the presumption."). Accordingly, Equistar is not entitled to summary judgment on this issue.

The final element of a preference, § 547(b)(5), requires a finding that the transfers enabled the creditor to receive more than it would if the case were a chapter 7 case and the transfers had not been made. As stated by one court, this requirement "simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.' " *Hager v. Gibson (In re Hager)*, 109 F.3d 201, 210 (4th Cir.1997)(quoting *Smith v. Creative Fin. Mgmt., Inc. (In re Virginia–Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir.1992)). With respect to preferential transfers to an unsecured creditor, any payment received by the creditor during the preference period is sufficient to satisfy this requirement unless there is a 100% distribution to creditors in the hypothetical chapter 7 case. *See Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir.1991). On the other hand, "[p]ayments to a creditor who is fully secured are not preferential since the creditor would receive payment up to the full value of his collateral in a Chapter 7 liquidation." *Ray v. City Bank & Trust Co. (In re C–L Cartage Co., Inc.)*, 899 F.2d 1490, 1493 (6th Cir.1990).

Equistar's § 547(b)(5) argument is that to the extent it is deemed a secured creditor, it did not receive more because of payments to it during the preference peri-

od than it would have otherwise received in a chapter 7 case. It is undisputed that the contract signed by IPI in connection with its purchase of Product from Equistar granted Equistar a purchase money security interest in the raw materials along with all products and proceeds thereof, and that Equistar duly perfected this security interest by filing a financing statement with the Tennessee Secretary of State. The rub, however, is that all of IPI's assets were and are subject to a blanket lien held by South Trust Bank, IPI's primary lender, which lien is superior to Equistar's security interest. Based on the value of IPI's assets and SouthTrust Bank's claim, it appears to be undisputed that Equistar's claim is undersecured, if not fully unsecured. And, Equistar does not challenge IPI's contention, supported by the affidavit of Mr. Carpenter, that IPI's unsecured creditors would receive nothing on their claims in a chapter 7 liquidation of IPI.

 The issue of whether payments to an undersecured creditor satisfy the § 547(b)(5) preference requirement was addressed by the Fifth Circuit Court of Appeals in *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP)*, 171 F.3d 249 (5th Cir.1999). As stated by the court therein:

To determine whether an undersecured creditor received a greater percentage recovery on its debt than it would have under chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes. Both aspects must be examined before the issue of greater percentage recovery can be decided.

(1) *The Application Aspect*

If a payment to an undersecured creditor [ ] is applied to the unsecured portion of the debt, then the undersecured creditor will have recovered a greater percentage on this claim if the estate cannot pay its unsecured creditors 100% of these claims. In contrast, if the undersecured creditor applies the payment to the secured portion of the debt, the creditor effectively releases a portion of its collateral from its security interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater percentage recovery. If, however, the creditor does not actually release collateral upon application of the payment, then the payment is ipso facto a payment on the unsecured portion of the claim.

· · · · ·

(2) *The Source Aspect*

Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.

*Id.* at 254–55 (citations omitted).

 Regarding the application aspect of the *El Paso Refinery* test, there is no indication that Equistar released a corresponding amount of collateral upon each payment from IPI. Instead, each payment to Equistar appeared to be "ipso facto a payment on the unsecured portion of [Equistar's] claim." *Id.* With respect to the source aspect, evidence submitted by IPI without challenge from Equistar indicates that Equistar was paid with money from a SouthTrust Bank line of credit rather than from proceeds of Equistar's collateral. Thus, under both "aspects," the

payments to Equistar were attributable to the unsecured portion of its claim. Because these payments permitted Equistar to receive more than it would otherwise in a chapter 7 case in light of the uncontradicted evidence that unsecured creditors would not receive 100% in a hypothetical liquidation, IPI has satisfied the fifth element of § 547(b). All of the elements of a preference under § 547(b) having been established, IPI is entitled to summary judgment unless Equistar prevails on the § 547(c)(4) defense.

## IV.

Based on the massive attention devoted to the issue by the parties in their briefs, responses, and replies, it is clear that the critical issue in this adversary proceeding is whether the subsequent advance or new value defense of § 547(c)(4) is available to Equistar. On this issue, Equistar has the burden of proof. *See* 11 U.S.C. § 547(g); *Phoenix Rest. Group, Inc. v. Ajilon Prof'l Staffing LLC (In re Phoenix Rest. Group, Inc.)*, 317 B.R. 491, 494 (Bankr.M.D.Tenn. 2004). Under § 547(c)(4), a preferential transfer may not be avoided—

> to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4). This exception encourages continuation of credit extensions to distressed companies by limiting the risk of loss to those creditors who continue dealing with the debtor on a credit basis, yet insulates other creditors from harm by requiring the preferred creditor to replenish the estate with new value. *See Charisma Inv. Co., N.V. v. Airport Sys., Inc. (In*

*re Jet Fla. Sys., Inc.)*, 841 F.2d 1082, 1083 (11th Cir.1988)("A subsequent advance is excepted because it is reasoned that a creditor who contributes new value in return for payments from the incipient bankrupt, should not later be deemed to have depleted the estate to the disadvantage of other creditors."); *In re Phoenix Rest. Group, Inc.*, 317 B.R. at 495 ("New value that replenishes the debtor balances the preferential effect of a prior transfer from the debtor.").

In its motion for summary judgment, Equistar asserts that during the ninety-day preference period, it gave subsequent new value totaling $429,312.05 to IPI in the form of Product deliveries and that these deliveries constitute under § 547(c)(4) a complete defense to this preference action. In response, IPI maintains that this defense is unavailable as a matter of law because neither subpart (A) nor (B) of § 547(c)(4) has been satisfied. According to IPI, the new value advanced by Equistar was "secured by an otherwise unavoidable security interest" in contravention of § 547(c)(4)(A). Additionally, asserts IPI, § 547(c)(4)(B) limits Equistar's new value defense to the Product deliveries that remained unpaid as of the bankruptcy petition date. Each of the arguments raised by IPI will be addressed in turn.

With respect to subpart (A) of § 547(c)(4), the language of the statute requires that any new value not be "secured by an otherwise unavoidable security interest." Undisputably, the new value shipped by Equistar to IPI was originally secured. Equistar maintains, however, that this security interest is "avoidable" due to the superior security interest of South Trust Bank which renders Equistar's security interest valueless. Equistar points out that under 11 U.S.C. § 506(a), it only has an allowed secured claim to the

extent of the value of its interest in the collateral and that under subsection (d) of § 506, "[t]o the extent that a lien secures a claim against the debt that is not an allowed secured claim, such lien is void . . . ."

IPI's response to this argument is that simply because a security interest is valueless does not mean that it is avoidable. IPI notes that § 547(c)(4)(A) makes no reference to § 506. According to IPI, "if a security interest is properly created, properly documented and properly perfected, as Equistar's security interest is in this case, the security interest is not avoidable. If the security interest in the new value is not avoidable at the time the new value is advanced, then the new value is not available to the creditor as a defense."

Unfortunately, no case has addressed the precise issue raised by the parties and few courts have even discussed subpart (A) of § 547(c)(4). Those referencing § 547(c)(4)(A) often inaccurately characterize the provision as requiring that the new value be unsecured. *See, e.g., Wolinsky v. Cent. Vermont Teachers Credit Union (In re Ford)*, 98 B.R. 669, 681 (Bankr. D.Vt.1989). However, the statute only insists that the new value not be "secured by an otherwise unavoidable security interest." As the treatise Collier on Bankruptcy recognizes, "The debt may be unsecured from the outset or secured by an avoidable security interest." 5 *Collier on Bankruptcy* ¶ 547.04[4] (15th ed. rev.2005). It is clear from the language of the statute that the relevant inquiry is not whether the new value was ever secured but whether the security interest is avoidable and thus ineffective in bankruptcy. "It should be emphasized that the section requires a prior determination of whether the security interest is valid in bankruptcy. If it is not, the creditor will lose the benefit of the security interest, but will be able to use

the entire, subsequent advance to protect a prior preference." 3 *Norton Bankr.L. & Prac.*2d § 57:20 (2004).

■ The most instructive case in this regard is the Fifth Circuit Court of Appeals' decision in *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336 (5th Cir.1999). The trustee in that case argued that the preference creditor could not utilize the § 547(c)(4) defense because it retained a security interest in the new value goods at the time of shipment although the interest was unperfected and unenforceable under Texas law due to subsequent payment by the debtor. *Id.* at 335. According to the trustee, it was irrelevant that the security interest was unenforceable, the only relevant inquiry was whether the security interest was "avoidable" by actual operation of the avoidance powers. Because it was not, argued the trustee, the shipments could not constitute new value. *Id.* The lower courts agreed with the trustee, but the Fifth Circuit Court of Appeals reversed. "We ... hold that section § 547(c)(4)(A) prevents the application of new value against prior preferences only if that new value is subject to a security interest that is valid and enforceable at the time of the bankruptcy." *Id.* at 336. As explained by the court:

> The trustee's argument necessarily assumes that Congress was concerned with the mere existence, at any time, of security interests, rather than their enforcement and subsequent diminishing of the estate. However, the text of the statute indicates clearly that this is not the case. The statute concerns itself not with all security interests, but only with "otherwise unavoidable" security interests. This indicates that the proper temporal focus is not on the historical existence of security interests, but rather the existence of such interests at the

time of bankruptcy. If security interests exist at that time and the new value rule is invoked, the court should not allow the thus secured new value to be set off against past preferences if the security interests are otherwise unavoidable. However, if at the time of bankruptcy no such interest exists, the once secured new value may be applied against such preferences. Since no security interest existed at the relevant time, section 547(c)(4)(A) is facially inapplicable.

This interpretation of the statute is the only sensible, real world result. A key justification for the new value exception is that while the payment of preferences to the creditor diminished the estate, other creditors are not really worse off since the subsequent advance of new value replenishes the estate. *See In re Toyota*, 14 F.3d at 1091. This logic is obviously undercut if the creditor retains a valid, enforceable security interest in the new value. If section 547(c)(4)(A) did not exist, such a creditor could not only shield a past preference, but also enforce the security interest and recover the new value. The net effect on the estate would no longer be neutral, and the other creditors would have cause for complaint. But if the security interest originally attached to the new value is unenforceable—either because it has been extinguished or is avoidable—the mere fact it once existed cannot disadvantage the other creditors. The new value remains firmly fixed in the estate and available to all the credi-

tors. There thus is really no reason to prevent the set-off of this new value against prior preferences. *See Kroh Brothers*, 930 F.2d at 654 (stating that the availability of section 547(c)(4) "depends on the ultimate effect on the estate" and thus if a party could assert a secured claim against the estate the defense could not be invoked).

*Id.* at 335–36.

Applying this reasoning, it is immaterial in the present case that the new value shipped by Equistar was secured at the time of shipment. Instead, the appropriate inquiry is whether Equistar is secured and the extent of the security in the debtor's bankruptcy case. "If the creditor extending the credit is partially secured by a valid security interest, then the exception only applies to the extent that the creditor's collateral is less than the total claim against the debtor resulting from the extension of credit." 5 *Collier on Bankruptcy* ¶ 547.04[4] n. 46.[3] *See also* Robert H. Bowmar, *The New Value Exception to the Trustee's Preference Avoidance Power: Getting The Computations Straight*, 69 Am. Bankr.L.J. 65, 83 (Winter 1995)("[S]ubparagraph (A) would permit the offset of new value against a prior preferential payment to the extent that the new value is not secured—that is, a pro tanto approach should be taken in the case of the partially secured, or undersecured, creditor.") (citing Raymond T. Nimmer, *Security Interests in Bankruptcy: An Overview of Section 547 of the Code*, 17

---

3. The treatise on the Uniform Commercial Code by Professors White and Summers lends additional support for this view:

If the creditor is undersecured, the new advance, even though nominally secured, may satisfy 547(c)(4). Assume an outstanding debt of $1 million, collateral of $200,000. Creditor makes a new loan, bringing the total to $1,100,000. Although this loan was under

the security agreement and was itself secured by the existing $200,000 of collateral, for this purpose it is not secured by an "otherwise unavoidable security interest," for under 506(a) it will be treated as an unsecured interest on liquidation of the debtor.

4 White & Summers, Uniform Commercial Code § 32–5 (5th ed.2004).

Hous. L.Rev. 289, 300 (1980)).[4] In *Southern Technical College, Inc. v. Graham Props. P'ship (In re Southern Technical College, Inc.)*, 199 B.R. 46 (Bankr.E.D.Ark. 1995), *aff'd sub nom. Southern Technical College, Inc. v. Hood*, 89 F.3d 1381 (8th Cir.1996), the preference creditor that had extended new value secured in part by a $11,846 security deposit was protected by the § 547(c)(4) defense to the extent of the unsecured portion. Similarly, in *El Paso Refinery*, a secured preference defendant that had subordinated a portion of its security interest in the collateral to another creditor was able to assert the new value defense to the extent of its unsecured portion. *In re El Paso Refinery, L.P.*, 178 B.R. at 444. Likewise, in the present case, because Equistar is unsecured due to the superior security interest of South Trust Bank, it is able to take advantage of the § 547(c)(4) defense.

■ As reasoned by the Fifth Circuit Court of Appeals in *Micro Innovations*, this conclusion is supported by the rationale underlying the § 547(c)(4) defense. To rule in favor of IPI would mean that not only does Equistar lose the benefit of its security interest, but that it also is precluded from utilizing the new value defense, notwithstanding that it replenished the estate by the new shipments of Product, in effect returning the preferential payments received by it. *See In re Micro Innovations Corp.*, 185 F.3d at 336. *See also Moglia v. American Psychological Assoc. (In re Login Bros. Book Co., Inc.)*, 294 B.R. 297, 300 (Bankr.N.D.Ill. 2003)("[T]he relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate."). The inconsistency of this result was recognized by the court in *Micro Innovations:* "The trustee ... in effect maintains that an extinguished security interest must be treated as a live security interest for the purpose of allowing him to recover payment [under § 547(b)(5) ], but as an extinguished security interest for the purpose of allowing him to maintain possession of the collateral. The bankruptcy court and the district court followed the trustee's logic. We cannot ...." *Id.* at 332. Based on the forgoing, this court concludes that Equistar has satisfied the element of the new value defense set forth in § 547(c)(4)(A).

The court turns next to subpart (B) of § 547(c)(4), which requires the creditor to establish that "on account of[the subsequent] new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4)(B). IPI maintains that under this provision, the new value must remain unpaid in order to offset the preferential transfers. The courts are split on this issue, with three circuit courts of appeals having adopted this interpretation and three others having rejected it in more recent rulings, construing the statute to only require that the subsequent new val-

---

4. As stated by Professor Nimmer:

Section 547(c)(4) requires that the subsequent new value not be secured by a security interest that is unavoidable in bankruptcy. Although arguably not explicit in this section, the drafters apparently intended to continue prior law to the effect that a partially secured advance can be used to protect a preference *to the extent* that the advance is unsecured. The purpose of such a limitation is obvious. To the extent that the subsequent new value is secured by a valid security interest, the trans-

fer has not effectively replenished the estate. It should be emphasized at this point that the section requires a prior determination of whether any involved security interest is valid in bankruptcy. If the security interest is not valid, the creditor will lose the benefit of the security interest, but will be able to use the subsequent advance to exempt a prior preference.

Raymond T. Nimmer, 17 Hous. L.Rev. at 300 (emphasis in original).

ue not be paid "by an otherwise unavoidable transfer." *Compare New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York Shoes Inc.)*, 880 F.2d 679, 680 (3d Cir.1989); *Matter of Prescott*, 805 F.2d 719, 728 (7th Cir.1986); *In re Jet Florida Sys., Inc.*, 841 F.2d at 1083 (all holding that the new value must remain unpaid) *with Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir.1997); *Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 231–32 (9th Cir.1995); *Laker v. Vallette (Matter of Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1092 (5th Cir.1994)(rejecting the "remain unpaid" construction). The Sixth Circuit Court of Appeals has not addressed the issue, but the "emerging view" and the consensus of the bankruptcy courts within this circuit that have considered the issue is that the "remain unpaid" approach is inconsistent with the plain language of the statute which only requires that the new value not be paid by "an otherwise unavoidable transfer." *See* Deborah L. Thome & Jesus E. Batista, *Are All Creditor "Animals" Equal? Treatment of New Value Under § 547*, 23 Am. Bankr.Inst. J. 22 (April 2004)(noting "emerging view"); *In re Phoenix Rest. Group, Inc.*, 317 B.R. 491, 499 (Bankr.M.D.Tenn.2004)("Had Congress intended 'otherwise unavoidable' to mean that new value must remain unpaid, it would simply have said so."); *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 472 (Bankr. S.D.Ohio 2004)("[V]ery few recent lower court decisions, which are clearly not bound by a particular circuit's ruling, have followed the 'new value must remain unpaid' axiom."); *Information Packaging, Inc. v. Golden Eagle Products, Inc. (In re Information Packaging, Inc.)*, 297 B.R. 521, 524 (Bankr.M.D.Tenn.2003)("Section 547(c)(4) was not 'designed to limit credit

for subsequent advances only to advances that remained unpaid ....' ")(quoting *Katz v. Ida K. Stark Trust (In re Van Dyck/Columbia Printing)*, 289 B.R. 304, 315 (D.Conn.2003)); *Boyd v. The Water Doctor (In re Check Reporting Servs., Inc.)*, 140 B.R. 425, 432–33 (Bankr.W.D.Mich. 1992)(The requirement that new value remain unpaid is an "inaccurate and confusing paraphrase of a clearly stated statutory purpose.")(quoting *Valley Candle Mfg. Co. v. Stonitsch (In re Isis Foods, Inc.)*, 39 B.R. 645, 653 (W.D.Mo.1984)).

■ This court agrees with the analyses of those courts, particularly those of my learned colleagues Judges Waldron and Lundin in *Roberds* and *Phoenix*, respectively, and concludes that § 547(c)(4)(B) only requires that the new value not be paid by an "otherwise unavoidable transfer." As explained by Judge Waldron:

[T]he proper inquiry directed by section 547(c)(4)(B) is whether the new value has been paid for by "an otherwise unavoidable transfer." This inquiry follows the *Kroh Bros.* [930 F.2d 648 (8th Cir.1991) ] rationale that a creditor should not get double credit for an advance of new value. However, instead of barring the new value defense altogether anytime new value has been repaid, this approach allows the new value defense if the trustee can recover the repayment by some other means.

This analysis fully comports with the statute's plain language. While the phrase "the debtor did not make an otherwise unavoidable transfer" is complicated, it is not ambiguous and its meaning is easily discernible.

*In re Roberds, Inc.*, 315 B.R. at 470 (citations omitted). *See also* Robert H. Bowmar, 69 Am. Bankr.L.J. at 75 ("A payment by the debtor made subsequent to a particular extension of new value does not di-

minish the new value unless the payment is not avoidable on any basis other than the (c)(4) exception itself.... It is only if the payment is unavoidable because of the applicability of one of the other exceptions in subsection (c) or because of the applicability of some other Code provision, that the payment should be applied to reduce the new value.").

Judge Lundin adds to this discussion by observing:

> Had Congress intended "otherwise unavoidable" to mean that new value must remain unpaid, it would simply have said so. Indeed, § 60(c) of the Bankruptcy Act, the predecessor to § 547(c)(4), specifically provided that only "the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable" from the creditor as a preference. 11 U.S.C. § 96(c) (repealed). The word "unpaid" is conspicuously absent from § 547(c)(4). Reinserting a word from the prior statute that Congress omitted is supported by no theory of statutory construction.

*In re Phoenix Rest. Group, Inc.*, 317 B.R. at 499 (citations omitted).

Based on the foregoing, the court rejects IPI's assertion that the new value must remain unpaid. Instead, "the new value defense is permitted unless the debtor [repaid] the new value by a transfer which is otherwise avoidable." *In re Roberds, Inc.*, 315 B.R. at 471. Accordingly, IPI's mo-

tion for summary judgment on this issue will be denied.

With respect to whether Equistar is entitled to summary judgment based on § 547(c)(4), it must first be noted that IPI has offered no evidence challenging the factual foundation for this defense, that Equistar provided IPI with new value shipments subsequent to and in excess of the amount of preferential payments received by Equistar.[5] According to Equistar's records submitted in support of its summary judgment motion, the subsequent new value given by Equistar in the form of Product deliveries totaled $429,312.05, allegedly providing a complete defense to the preference action by IPI. The court's review of the record, however, indicates that Equistar's first shipment of "new value" for which Equistar is seeking to reduce its preference exposure does not constitute new value within the meaning of § 547(c)(4) because it was not given "subsequent" to Equistar's receipt of a preferential transfer as required by the statute. The first preferential payment after the commencement of the preference period was made by wire transfer to Equistar on August 14, 2003. Equistar seeks to offset this payment by a shipment in the amount of $57,115.52 received by IPI after this date, but shipped by Equistar on August 13, prior to its receipt of the first preferential transfer. New value is given when the goods are shipped or given by the creditor rather than received by the debtor. *See Rushton v. E & S Int'l Enters., Inc. (In re*

---

**5.** IPI did state in the "Conclusion" section of its motion for summary judgment that Equistar's summary judgment motion should be denied because there is a genuine issue of material fact as to "the amount of new value for which Equistar is entitled to credit against the preferential transfers received." However, IPI submitted no evidence, in affidavit form or otherwise, that contradicted Equistar's proof as to the amounts of new value

given by it. *See Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548 (The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, "designate" specific facts showing that there is a genuine issue for trial.' "). Absent evidentiary support, IPI's assertion that there are material facts in dispute must be rejected.

*Eleva, Inc.)*, 235 B.R. 486, 489 (10th Cir. BAP 1999)("The relevant date to determine when new value is given is the date of the shipment of the goods."); *Gonzales v. DPI Food Products Co. (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33, 45 (Bankr.D.N.M.2003)(adopting *In re Eleva*); *In re Tenn. Chem. Co.*, 159 B.R. at 513 (parties agreed that new value given when product shipped); *Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg., Inc.)*, 62 B.R. 684, 687 (Bankr.N.D.Ill.1986)(observing in dicta that new value extended on date shipped); *Rovzar v. Prime Leather Finishes Co. (In re Saco Local Dev. Corp.)*, 30 B.R. 859, 862 (Bankr.D.Me.1983)(applying date of shipment rule). *But cf. In re Schwinn Bicycle Co.*, 205 B.R. at 568 ("[T]he new value is deemed to have been given when the goods are actually delivered to the debtor, rather than when the creditor chooses to calculate the price of the goods or to bill for them."); *Bash v. Am. Tool Cos. (In re George Worthington Co.)*, 163 B.R. 115, 118 (Bankr.N.D.Ohio 1994)(same); *Fitzpatrick v. Cent. Communications and Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R. 949, 957 n. 2 (Bankr.E.D.Tenn.1996)(utilizing date of delivery). This result is mandated by the plain language of the statute, which speaks in terms of new value "given" by the creditor rather than "received" by the debtor. *See* 11 U.S.C. § 547(c)(4)("to the extent that, after · such transfer, such creditor gave new value to or for the benefit of the debtor"). In addition, it is consistent with the policy considerations · which underlie the exception.

The purpose of § 547(c)(4) is to encourage creditors to deal with troubled businesses. If that is the purpose, the Court believes that the relevant date to determine when new value is given is the date of the shipment of the goods. In this case, E & S extended credit and shipped the goods before the preference occurred. New value cannot be given as an aforethought. Further, use of the delivery date would treat creditors arbitrarily based on the method of shipment used or distance the product must travel.

*In re Eleva, Inc.*, 235 B.R. at 489 (citations omitted).

Because Equistar gave new value when it shipped Product to IPI on August 13, 2003, this shipment does not shelter the preferential payment made by IPI to Equistar on August 14, 2003.

■ The other shipments by Equistar, however, do appear to constitute subsequent new value for which Equistar is entitled to reduce its preference exposure. As indicated on the spreadsheet attached to this memorandum opinion, IPI's first preferential payment to Equistar was on August 14, 2003, in the amount of $154,887.20. Subsequently, Equistar advanced new value to IPI of $13,637.44 and $12,901.76 on August 14, 2003, and $13,613.12 on August 15, 2003. These transactions created a net avoidable preference balance of $114,734.88. The next payment by IPI to Equistar during the preference period was for $27,300.60, of which $27,195.84 was a prepayment, leaving $104.76 applied to antecedent debt, as discussed *supra*, and increasing the preference balance to $114,839.64. Equistar made additional advances of $13,607.04 on August 18, 2003, and $55,176.00 on August 19, 2003, reducing the avoidable preference balance to $46,056.60. IPI wired $101,441.00 to Equistar on August 21, 2003, increasing the avoidable preference total to $147,497.60, but Equistar subsequently advanced $27,378.24 on August 23, 2003, and $56,635.20 on August 25, 2003, leaving an avoidable preference total of $63,484.16. IPI's next payment to Equis-

tar occurred on September 12, 2003, in the amount of $83,513.48, followed by an Equistar advance of $14,579.42 on September 13, 2003, with a new avoidable preference total of $132,418.22. Finally, on September 15, 2003, IPI wiretransferred $13,613.12 to Equistar, which then made the following seven advances: September 15, 2003, $64,372.86; September 17, 2003, $14,605.55 and $14,919.09; September 18, 2003, $14,710.06; September 20, 2003, $14,292.02; and September 21, 2003, $14,572.89. Applying these advances to the preference balance produces a remaining preference balance of $8,558.87. Accordingly, Equistar's motion for summary judgment based on the § 547(c)(4) defense will be granted except to the extent of $8,558.87.

### IV.

Contemporaneously with the filing of this memorandum opinion, the court will enter an order granting in part and denying in part the parties' motions for summary judgment. The order will also provide for the avoidance and recovery pursuant to 11 U.S.C. §§ 547(b) and 550 of preferential payments to Equistar in the amount of $8,558.87 and IPI will be awarded judgment against Equistar in this amount plus prejudgment interest from the date of demand.